UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

TINA M. BLACK,

                Plaintiff,

v.

BARRETT BUSINESS SERVICES, INC.,

                Defendant.

Case No. 1:18-CV-00096-CWD

**MEMORANDUM DECISION AND ORDER**

## INTRODUCTION

This is an action brought by Tina Black, a former employee of Barrett Business Services, Inc. (BBSI), under the Equal Pay Act (29 U.S.C. § 206(d)(1)), and Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e *et seq*.). Pending before the Court is BBSI's Motion for Summary Judgment. (Dkt. 30.) The motion has been fully briefed and oral argument was held on April 10, 2019. (Dkt. 34.) For the reasons that follow the Court will grant the motion.

## FACTUAL BACKGROUND

BBSI provides human resources services to client companies through employee staffing and recruiting. (Dkt. 30-2 at 2.) BBSI has business operations in Idaho and eleven other states. *Id.* Black worked at BBSI's Twin Falls, Idaho office as a branch

manager for approximately ten years. (Dkt. 1 at 2.) In her complaint, Black alleges BBSI discriminated against her because of her sex. She argues BBSI paid equally qualified male branch managers more than what she was paid. The relevant details regarding this dispute are set forth below in the light most favorable to Black, the non-moving party.

BBSI employs approximately 60 branch managers nationally. (Dkt. 30-2 at 2.) At the time Black's employment was terminated, BBSI had three separate branches in Idaho—Twin Falls, Idaho Falls, and Boise/Meridian (Meridian). (Dkt. 30-2 at 2.) Black was the only branch manager working at the Twin Falls branch during her tenure. *Id.* In her role, Black was responsible for determining employee schedules at the branch, for managing the branch budget, and for developing branch business by growing the client base. *Id.*

A branch manager's salary level is guaranteed; however, a branch manager must meet branch sales goals to earn bonus commissions. BBSI uses the same formula to calculate bonus commissions for all branch managers. *Id.* at 3. "The bonus calculation is applied on a sliding scale such that the lower [a branch] manger's base pay, the higher the bonus percentage applied to that manager's bonus calculation. The higher a manager's base salary, the higher the threshold that manager has to reach to earn bonus income." (Defendant's Statement of Undisputed Facts, Dkt. 30-2 at 3.) BBSI determines branch manager base salaries on a case-by-case basis through consideration of numerous factors, including prior business experience, education level, demonstrated community involvement, potential for business development, sales experience, location of the branch,

and the manager's overall potential to grow branch business and increase the client base. *Id.*

Black was hired by BBSI in 2005 in the role of location manager in its Twin Falls branch. (Dkt. 30-2 at 2.) In 2006, Black was promoted to branch manager. *Id.* Her starting base salary was $60,000. *Id.* According to Black's complaint, sometime between 2006 and 2007, she had a telephone conversation with Mike Elich, then BBSI's chief operating officer. (Dkt. 1 at 3.) During the conversation, Black asked Elich about salary raises. *Id.* In response, Elich informed her that all BBSI branch managers made the same base salary and raises were awarded based on branch profitability and the addition of new clients.[1] *Id.*

Several years later, in 2011, Black attended a BBSI organizational meeting in Salt Lake City, Utah. *Id.* According to Black, at the meeting, a female employee asked Elich why management positions, like Black's, were virtually exclusive to male employees. *Id.* at 3-4. Elich responded to the question by citing that at least 10 percent of BBSI's branch managers were women. *Id.* at 4. BBSI terminated the female employee's employment the day after the meeting. *Id.* There are no facts in the record to explain BBSI's reason for terminating this individual's employment.

Black made a similar inquiry sometime between 2011 to 2012 during a private meeting with Peter Schenk, who then served in BBSI's corporate offices. *Id.* Black asked Schenk what qualities Elich saw in male managers that he did not see in female

---

[1] In February 2011, Elich assumed the roles of Chief Executive Officer and President. (Dkt. 13 at 3.)

managers. *Id.* Black asserts that Schenk did not answer her question and warned her against making a similar inquiry with Elich or anyone else at BBSI. *Id.*

While acting as branch manager of the Twin Falls branch, Black earned a bonus commission for the quarters ending September 2013, December 2013, and March 2014, June 2014, September 2014, December 2014, March 2015, and September 2015. (Dkt. 32-1 at 28-38.) The record before the Court shows also that the Twin Falls branch added six staffing clients in May 2015. (Dkt. 32-1 at 38.) The record provides that Black's branch met a BBSI requirement of adding at least 12 clients per year. (Dkt. 32-2 at 3.) The undisputed facts show also that, under Black's management, the Twin Falls branch revenue declined from $5.1 million to $3.9 million from 2013 to 2015, a 32 percent decline. (Dkt. 30-3 at 3.)

On January 11, 2016, BBSI terminated Black's employment. At the time, Black's base salary was still $60,000 as she had never received a merit-based raise. *Id.* January 11, 2016 was also the date Black received her final paycheck. (Dkt. 32 at 3.) According to Black, BBSI "felt a change needed to be made." *Id.* Black asked for but did not receive severance pay. *Id.*

Approximately ten months later, on November 14, 2016, Black had a conversation with a BBSI branch manager named Melanie Hamilton. *Id.* Hamilton worked at BBSI's West Jordan, Utah branch. (Dkt. 32-2 at 4.) According to Black, Hamilton called her because BBSI management had scheduled a meeting with Hamilton for the next day. (Dkt. 32 at 3.) Hamilton told Black she was worried about being fired because two other female branch managers had recently been fired by BBSI management. *Id.* Black and

Hamilton discussed mutual concerns about sex-based discrimination at BBSI. (Dkt. 1 at 5.) Hamilton's employment was terminated the day after her conversation with Black— on November 15, 2016. (Dkt. 32 at 3.) There are no facts in the record to explain BBSI's reason for terminating Hamilton's employment. Black spoke with Hamilton again on November 23, 2016. *Id.* During that conversation, Hamilton told Black that BBSI paid its male branch managers an annual salary of $100,000. *Id.* at 4.

## PROCEDURAL BACKGROUND

On January 9, 2017, Black filed an administrative complaint with the Idaho Human Rights Commission (IHRC) and the Equal Employment Opportunity Commission (EEOC) alleging BBSI committed sex-based wage discrimination.[2] (Dkt. 32-1 at 6-15.) On November 30, 2017, the EEOC issued Black a right to sue letter. (Dkt. 32-1 at 16-17.) On February 18, 2018, Black filed her complaint in this Court, asserting that BBSI violated (1) Title VII of the Civil Rights Act of 1964, specifically, the Lilly Ledbetter Fair Pay Act of 2009,[3] and (2) the Equal Pay Act. The factual basis for each claim is the same: Black asserts that BBSI knowingly paid Black less than it paid male branch managers who performed equal work, and also knowingly provided severance pay to similarly situated male employees but did not provide her with severance pay. (Dkt. 1

---

[2] Black's claims of sex-based wage discrimination in her IHRC complaint were made on the basis of alleged violations of the EPA and Title VII. Notably, none of the claims set forth in the IHRC complaint were based on state law. (*See* Dkt. 32-1 at 13-15.)

[3] The Lilly Ledbetter Fair Pay Act amends Title VII of the Civil Rights Act of 1964 and sets forth that the 300-day statute of limitations for filing a wage-based discrimination lawsuit under Title VII resets with each new paycheck affected by the discriminatory action. *See Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007).

at 6-7.) However, Black is no longer pursuing a claim under either law based on the alleged unequal provision of severance pay.[4]

On April 11, 2018, BBSI filed its answer denying each of Black's claims. (Dkt. 13.) On January 1, 2019, BBSI filed its motion for summary judgment. (Dkt. 30.) BBSI asserts Black's claims fail on the merits because Black has not established the requisite *prima facie* cases. BBSI also affirmatively defends its actions, arguing its salary decisions were based on legitimate, lawful reasons other than sex or gender. Additionally, BBSI argues each of the claims is time-barred by the applicable statute of limitations.

## STANDARD OF LAW

### 1. Motion for Summary Judgment

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). Evidence includes "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits...." *DeVries v. DeLaval, Inc.*, 2006 WL 1582179, at *5 (D. Idaho June 1, 2006), report and recommendation adopted, 2006 WL 2325176 (D. Idaho Aug. 9, 2006).

---

[4] During the hearing on the motion, counsel for Black confirmed that she is not proceeding with her claims based on the severance pay issue because there is no evidence that any similarly situated male employee received severance pay. (*See* Schenk Pay Record, Dkt. 30-6 at 21.)

The moving party initially bears the burden to show no material fact is in dispute and a favorable judgment is due as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets this initial burden, the non-moving party must identify facts showing a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). The Court must enter summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**ANALYSIS**

A sex-based wage discrimination claim may be brought under the Equal Pay Act or Title VII, or, as is the case here, under both laws. The Court will review the relationship between these two statutes before the Court analyzes the merits of the motion for summary judgment.

**1.  Equal Pay Act Claim**

The Equal Pay Act (EPA), which is part of the Fair Labor Standards Act of 1938, is squarely focused on wage disparities based on gender. Simply put, the EPA prohibits paying men and women differently for equal work. 29 U.S.C.A. § 206(d)(1). Under the EPA, a plaintiff bears the burden of proving a *prima facie* case alleging wage discrimination on the basis of gender. *Stanley v. University of S. Cal.*, 178 F.3d 1069, 1073-74 (9th Cir. 1999). To meet the burden, a plaintiff must show that the jobs compared are "substantially equal" and that equal pay was not received by a person of

one gender for the substantially equal work of a person of another gender. *Id.* at 1074.

Notably, a plaintiff need not show the employer had any intent to discriminate. *Id.*; *see*

*EEOC v. Delaware Dept. of Health and Social Services*, 865 2d 1409 (3rd Cir. 1989).

The jobs need not be identical to be substantially similar. *Id.* However, a plaintiff must

show the jobs require similar skills, effort, and responsibility and were performed under

similar conditions—i.e., that the jobs have a "common core" of tasks. *Id.* (citing *Stanley*

*v. Univ. of S. Calif.*, 178 F.3d 1069 at 1074 (9th Cir. 1999). Additionally, the EPA

requires that the employees were employed in the "same establishment." *Id.*

If a plaintiff meets the EPA's initial burden, the burden shifts to the defendant

employer to show the pay disparity was due to some factor other than the employee's

gender. *Garner v. Motorola, Inc.*, 95 F. Supp. 2d 1069, 1074 (D. Ariz. 2000), aff'd, 33 F.

App'x 880 (9th Cir. 2002). The EPA "establishes four affirmative defenses upon which

the defendant can rely […]. These defenses permit instances of disparate pay caused

pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures

earnings by quantity or quality of production; or (iv) a differential based on any other

factor other than sex." *Id.* (citing 29 U.S.C. § 206(d)(1) (citations omitted)).

If a defendant employer shows the disparate pay was based on a lawful reason, the

burden shifts back to the plaintiff to show the reason supplied by the defendant employer

is pretextual and conceals a discriminatory motive or intent that resulted in the pay

disparity. *Id.*

## 2.    Title VII Claim

Unlike the EPA which is squarely focused on wage disparities based on gender, Title VII more broadly prohibits workplace discrimination based on race, color, religion, sex, and national origin. Civil Rights Act of 1964, § 701 *et seq.*, 42 U.S.C. § 2000e *et seq.* Courts analyze Title VII claims through the burden-shifting framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 793 (1973). Under this framework, a plaintiff must first establish a *prima facie* case of sex-based discrimination by showing that: (1) she belongs to a protected class; (2) she was qualified for her position and was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).

Unlike the EPA, Title VII does not require a plaintiff to prove the requirements of "equal work" and "similar working conditions." However, "Title VII and the Equal Pay Act overlap and where, as here, plaintiff brings a wage discrimination claim, Equal Pay Act standards apply to the Title VII claim." *Wachter-Young v. Ohio Cas. Grp.*, 236 F. Supp. 2d 1157, 1161 (D. Or. 2002). Notably, the *McDonnell Douglas* framework is "not intended to be an inflexible rule." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575 (1978). The framework allows for a plaintiff to establish a *prima facie* case by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII." *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1353-54 (2015) (internal citations omitted).

**MEMORANDUM DECISION AND ORDER – 9**

Therefore, under both the EPA and Title VII, if a plaintiff meets her initial burden, the burden of evidence production shifts to the employer defendant "to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn* at 1155. Through legislation known as the "Bennett Amendment," Congress expressly incorporated the four affirmative EPA defenses into Title VII wage-based claims. *See* 42 U.S.C. § 2000e–2(h) (1999); *see also* Bennett Amendment, Pub.L. No. 88–352, § 703, 78 Stat. 255 (July 2, 1964). When invoking the EPA-based affirmative defenses in the Title VII context, "the defendant employer bears the burden not only of coming up with some evidence supporting one of the four affirmative defenses but must also shoulder the burden of persuading the jury that the wage differential resulted from a factor other than gender." *Kouba v. Allstate Ins. Co.,* 691 F.2d 873, 875 (9th Cir. 1982). Therefore, a Title VII analysis of a wage discrimination claim is conducted with reference to the EPA allocation of the burdens of proof. *See id.* at 875-877; *Gunther v. County of Wash.,* 623 F.2d 1303, 1313 (9th Cir. 1979) ("Equal Pay Act Standards apply in Title VII suits when plaintiffs raise a claim of equal pay."), *aff'd,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

If the defendant employer produces that evidence, the burden shifts back to the plaintiff who must prove *intentional* discrimination despite the reasons advanced by the defendant employer. *Garner v. Motorola, Inc.*, 95 F. Supp. 2d 1069, 1074-75 (D. Ariz. 2000), *aff'd,* 33 F. App'x 880 (9th Cir. 2002). Thus, the present motion for summary judgment will be analyzed with respect to a claim under the EPA because that analysis is applicable to both statutes.

Of note, however, the standards for summary judgment in any employment discrimination case are rigorous. Courts in the Ninth Circuit "require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotations omitted). This is "especially true" in the context of employment discrimination actions "where motive is a factor." *Garner* at 1075.

### A.     *Black's Initial Burden*

In this matter, and in support of both her EPA and Title VII claims, Black compares her wages to the wages of three male BBSI branch managers—Neil Christensen, Jeremy Hix, and Jason Williams. Christensen is the male employee who replaced Black as branch manager of BBSI's Twin Falls branch in 2016. Christensen was hired at a base salary of $100,000. In 2011, Hix was hired as branch manager of BBSI's Idaho Falls location at a base salary of $85,000. (Dkt. 32 at 16.) In 2018, Williams was hired as branch manager of BBSI's Meridian location at a base salary of $100,000. *Id.* at 7, 12, and 17.

As a preliminary argument, BBSI asserts Hix and Williams did not work in the "same establishment" as Black and thus do not meet the EPA's same establishment requirement. In *Foster v. Arcata Assocs., Inc.*, the Ninth Circuit set forth factors for a court to determine whether different offices constitute the same establishment for purposes of the EPA. 77 F.2d 1453 (9th Cir. 1985). According to the decision, in addition

to considering the geographic distance between offices, a court must also consider "the nature of the services provided and the degree of central administration, such as budgeting, hiring, and day-to-day management, as well as the extent of physical separation." *Winther v. City of Portland*, 21 F.3d 1119 (9th Cir. 1994).

In *Winther*, the Ninth Circuit considered whether a city-run emergency communications office and a city-run fire alarm dispatch office were the "same establishment" under the EPA. *Id.* The court found the provision of some complimentary services, including responding with joint services to medical emergency 911 calls, was insufficient to make the two offices a single establishment under the EPA. *Id.* In reaching its decision, the court highlighted that the two offices served different functions despite sometimes working together to provide their respective services. *Id.* Additionally, the court noted that each office had independent management, including the fact that each department made independent hiring decisions. *Id.* Furthermore, there was no interchange of personnel between the departments. *Id.* And, despite the fact that ultimate wage-setting authority rested with a joint personnel director who served both offices, the court found the facts considered as a whole "did not raise any issue" as to whether two offices were really one establishment under the EPA. *Id.*

As in *Winther*, the facts considered as a whole in this matter similarly do not raise any issue as to whether the Idaho Falls and Twin Falls or Meridian and Twin Falls branches are, in either case, the same establishment under the EPA. First, the Twin Falls and Meridian offices are geographically distinct from the Idaho Falls office. Second, other factors, when considered as a whole, show the offices are not one establishment for

purposes of the EPA. For example, the facts, when viewed in a light most favorable to Black, show that there was no interchange of employees between the Twin Falls office and the Idaho Falls and Meridian offices. The facts show also that each office was managed independently by the branch managers, that each office had its own sales and profitability goals, that each office serviced and solicited distinct clients, and that there was never any significant overlap in the daily operations between either of the two offices. In sum, the Court finds there is no genuine material issue of fact that would suggest that either the Twin Falls office and the Idaho Falls office or the Twin Falls office and the Meridian office could be considered the same establishment under the EPA.

Provided the foregoing, Black's EPA-based claim is constrained to facts related to Christensen—who was hired to work at the Twin Falls branch office. However, as Title VII does not share the EPA's same establishment requirement the Court will also consider Black's other comparators, Hix and Williams, for purposes of analyzing that claim.

Black's initial burden under the EPA requires her to show BBSI paid different wages to an employee of the opposite sex for doing substantially similar work. Christensen testified that his day-to-day activities include managing two sales teams and two business units, bringing on new clients, and maintaining client and referral relationships. (Christensen Depo., Dkt. 32-1 at 23.) Likewise, in her role as branch manager, Black was responsible for determining employee schedules at the branch, for

managing the branch budget, and for developing business by maintaining client relationships and bringing on new clients. (Dkt. 30-2 at 2.)

It is an undisputed fact that Black's starting salary and her salary at termination was $60,000, and that Christensen's starting salary was $100,000. Provided the foregoing, the Court finds that, for summary judgment purposes regarding the EPA claim, Black has established that BBSI paid different wages to a male branch manager for doing work substantially similar to her own. *Wachter-Young v. Ohio Cas. Grp.*, 236 F. Supp. 2d 1157, 1163 (D. Or. 2002). Likewise, under Title VII's flexible *McDonnell Douglas* framework, for summary judgment purposes, Black as also met her initial evidentiary burden as it is undisputed that Williams' starting salary was $100,000, and that Hix's starting salary was $85,000, and that each performs work substantially similar to the work Black performed as a branch manager. (*See* Dkt. 30-2 at 7.)

**B.      *BBSI's Burden to Show a Permissible Wage Disparity***

Provided that Black has met her initial burdens under each law, the burden shifts to BBSI to show a permissible wage disparity by providing evidence of one or more of the four statutory exceptions: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). "These exceptions are

affirmative defenses, which the employer must plead and prove."[5] *Wachter-Young* at 1164.

BBSI asserts that the starting salaries of Christensen, Williams, and Hix were based on differentials other than sex. BBSI asserts Christensen's starting salary was based on consideration of his "experience, education, leadership ability, community involvement, community leadership, business acumen, and the fact that he has owned, built, and managed two businesses." (Dkt. 30-1 at 9.) BBSI asserts also that Christensen's specific experience in creating, building, and selling two of his own businesses was experience BBSI highly valued when making its decision to hire him as manager of the Twin Falls branch. (Dkt. 30-1 at 8-9.) Prior to being hired by BBSI, Christensen owned an Allstate Insurance Company agency from 2005 through 2014. (Dkt. 30-1 at 9.) From 2014 through 2016, Christensen owned and operated a general contracting business. *Id.* BBSI similarly asserts that Williams' starting base salary of $100,000 was premised on consideration of his experience in sales, experience as a recruiter, and experience owning and running his own business for six years. BBSI asserts also that Williams negotiated his starting base rate. BBSI asserts its reasons for hiring Hix at a starting salary of $85,000 was similarly based on his prior experience; Hix built-up and sold two of his own businesses.

---

[5] Notably, the EPA "entrusts employers, not judges, with making the often uncertain decision of how to accomplish business objectives." *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876-77 (9th Cir. 1982). The EPA's standard is thus pragmatic—at once protecting against abuse while also accommodating employer discretion. *Id.* at 876-77.

In comparison, prior to being hired by BBSI, Black worked from 1989 to 1994 as a credit manager and customer service representative. (Dkt. 32 at 14; Dkt. 30-7 at 14-15.) From 1994 to 1997, Black worked for a temporary staffing service as an account manager. (Dkt. 30-7 at 15-16.) Starting in 1997, Black worked with another employment service company as an area manager. *Id.* at 19-20. Later, from 2000 to 2004, Black worked as the director of operations for an in-home health care provider. *Id.* at 12-13. And prior to being hired by BBSI, Black worked as an independent business consultant for approximately one year. *Id.* In addition to her prior work experience, Black had 10 years of experience in sales and management—as she worked at BBSI in the branch manager capacity for a decade. *Id.*

BBSI argues that its base annual salary decisions regarding Christensen, Hix, and Williams were in line with a new hiring strategy BBSI began to implement over time. *Id.* at 12. BBSI asserts that, in 2014, it began hiring branch managers with experience that would allow them to successfully "build their branches into multi-million dollar revenue centers." *Id.* The specific aim of BBSI's strategy was to find managers with the requisite skill to expand BBSI's "Professional Employer Organization" (PEO) service. *Id.* at 2. The PEO business is important to BBSI because it generates sustained revenue and profitability over time. *Id.* at 6.

In line with its new hiring strategy, BBSI hired branch managers at higher base salaries to attract talent across its geographically diverse business markets. *Id.* at 5-6. BBSI asserts that, under this new structure, pay ranges varied based on numerous factors, including prior experience owning and managing businesses, education, as well as the

timeframe in which the branch manager was hired and the location of the branch they were hired to manage. (*See* Dkt. 30-2 at 5-8.)

Despite Black's career experience, BBSI's reasons for hiring Christensen, Hix, and Williams remain distinct from the sales and management experience she had—i.e., each of them had experience starting, building, managing, and selling their own businesses. Black did not. Black does not challenge BBSI's assertion that it changed its hiring strategy for branch managers, and that Christensen, Hix, and Williams fit within the new hiring strategy. Thus, BBSI's reason for hiring Christensen, Hix, and Williams at higher base salaries satisfies BBSI's burden of showing a legitimate nondiscriminatory reason for the challenged action.

Because BBSI has shown the disparate annual salaries were based on legitimate nondiscriminatory reasons, the burden shifts back to the Black to show the reasons supplied by BBSI are pretextual and conceal a discriminatory motive or intent that resulted in the pay disparities.

### C.     *Black's Burden to Show BBSI's Reasons are Pretextual*

In the context of a wage discrimination claim, a plaintiff employee can prove pretext: (1) "directly, by showing that unlawful discrimination more likely motivated the employer"; or (2) "indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849 (9th Cir. 2004) (internal quotation marks omitted).

Direct evidence of discriminatory intent is "evidence which, if believed, proves the fact of discriminatory animus *without inference or presumption*." *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017) (emphasis in original) (internal quotation omitted). Circumstantial evidence of discriminatory intent is "specific and substantial evidence challenging the credibility of the employer's motives." *Id.* at 1282.

In this matter, Black challenges the credibility of BBSI's motives through argument that the experience possessed by Christenson, Hix, and Williams was not the type of extraordinary experience that would justify each of their significantly higher base annual salaries—especially in light of Black's own experience working as a branch manager for 10 years. (Dkt. 32 at 14-15.) Second, Black challenges the credibility of BBSI's motives by asserting she was not provided support necessary to build the PEO business at the Twin Falls branch. Specifically, she highlights the fact that, when Christensen took over the Twin Falls branch, he received two additional employees. Third, Black asserts that she was not afforded the opportunity to become a mentor to other branch managers. *Id.*

As detailed above, despite Black's comparative experience, including her experience working as the Twin Falls branch manager, BBSI's reason for hiring Christensen, Hix, and Williams at higher base salaries is distinct: each of them had experience starting, building, managing, and selling their own businesses. Black does not dispute this fact as to any of the three hires. Further, Black does not present evidence that would support or create an inference that BBSI's decision to value prior business

ownership experience is a pretextual reason created to disguise a true discriminatory motive or intent.

Nor has Black presented evidence that supervisors or fellow branch managers made comments concerning her experience that would suggest discriminatory animus on the part of BBSI. (*See Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1278-79 (9th Cir. 2017). The evidence supplied by Black in this regard is remote in time and remote to her own work. For example, Black cites the 2011 meeting where a female employee asked BBSI's COO why branch manager positions were "virtually exclusive" to male employees. (Dkt. 1 at 3.) In response, the COO remarked that at least 10 percent of the branch manager positions were held by women at that time. *Id.* Black notes BBSI terminated the worker's employment the next day. Black also cites the single occasion sometime between 2011 and 2012, when she asked another male manager a question about what the COO saw in male branch managers that he did not seen in female branch managers. *Id.* Black asserts she was denied an answer and warned not to ask others at BBSI any similar questions. *Id.* The Court finds these instances fall in the ambit of the type of "stay remarks" the United States Court of Appeals for the Ninth Circuit has held insufficient to establish discrimination. *See Merick v. Farmers Ins. Grp.*, 892 F.2d 1438-39 (9th Cir. 1990).

In addition, however, Black provides that she was not given the resources necessary to grow the PEO side of the business at the Twin Falls branch and was denied the opportunity to become a mentor to other branch managers. Mentorship roles were

valuable at BBSI because they could result in pay raises due to the extra responsibilities taken on by the mentor employee. (*See* Dkt. 32 at 16.)

Black's support for the contention that she was not given resources to enable her to build the PEO business is based on the fact that, when Christensen started as manager of the Twin Falls branch, BBSI added two employees. (Dkt. 32 at 15.) Black asserts that, despite the additional help, Christensen "failed to turn a profit."[6] *Id.* In response, BBSI characterizes the increased staff size at the Twin Falls branch as something Christensen was responsible for, i.e. "Christensen has increased the size of the Twin Falls office from three to five employees…." (Dkt. 30-2 at 7.)  BBSI asserts also that Christensen "has successfully developed more than a dozen PEO clients in his first two years at BBSI." (Dkt. 30-1 at 9.) Black testified during her deposition that she brought in three (3) total PEO clients during her 10 years at BBSI. (Dkt. 30-7 at 67.) She also testified that she was working on bringing in more and seeking training to do so. *Id.*

Of considerable note, Black does not challenge that BBSI was acting in its discretion to make the business-based decision to put a manager with different experience in the position of branch manager at the Twin Falls office. Therefore, although it is true BBSI added two employees at the Twin Falls branch after Black's employment was terminated, this fact standing on its own is not sufficient circumstantial evidence to raise an inference that BBSI's salary decisions were motivated by discriminatory intent.

---

[6] When Black's employment was terminated, there were three employees in addition to Black. (Dkt. 32 at 15.)

Lastly, Black asserts that she did not have the opportunity to become a mentor and thus was denied the salary raise that accompanies taking on mentorship responsibilities. Black points to Hix, the manager of the Idaho Falls branch. Hix became a mentor sometime after he was hired and received a salary increase. However, after carefully searching the record, the Court finds no evidence offered by Black or otherwise that would support an inference that the fact that Black did not have the opportunity to become a mentor was due to discriminatory intent on the behalf of BBSI. This fact standing alone does not create an internal inconsistency in relation to BBSI's reasons for hiring some branch managers at higher annual base salaries than Black's salary.

On the other hand, BBSI provides evidence that shows, over the course of 10-year period relevant to Black's claim, BBSI hired other female branch managers at base salaries higher than Black's and higher than other male branch managers. BBSI also provided the Court with evidence that shows there were male branch managers who were hired in a similar timeframe as Black, and like her, never received a base salary raise during their tenure. Additionally, BBSI provides evidence that shows it did increase the base salaries of certain female branch managers over time.

For instance, the following chart shows the base salaries of six other female branch managers hired in 2006. The salaries of these managers increased over time while Black's salary remained the same:

| Name | Base Salary (2006) | Base Salary at Present or Year of Separation |
|------|--------------------|----------------------------------------------|
| Tina Black | $60,000 | $60,000 (2016) |
| J.G. | $60,000[3] | $100,000 (present) |
| S.H. | $50,000 | $85,000 (2016) |
| D.H, | $50,000 | $80,000 (2013) |
| D.L. | $45,000 | $50,000 (2010) |
| L.P. | $100,000 | $140,000 (present)[4] |
| M.W. | $60,000 | $85,000 (2016)[5] |

(Dkt. 30-1 at 11.)

Gerald Blotz, BBSI's Vice President and Chief Operations Officer from 2002 forward, testified that "Black's salary remained the same because she failed to build revenue and a structure to support the full market potential of her area." (Dkt. 30-3 at 2.) According to Blotz, branch managers who did receive raises in base salary demonstrated an ability to build up their branches to capitalize on the full market potential of their areas. *Id.* at 2-3. Blotz testified also that Black was unable to add the PEO business as desired by BBSI. Finally, Blotz provided that, although Black's branch was slightly profitable in some years, the Twin Falls branch revenue declined from $5.1 million to $3.9 million from 2013 to 2015—a 32 percent decline. *Id.* at 3. Black does not dispute these facts about her performance or about the drop in her branch's profitability.

Another chart provided by BBSI shows the base salaries of seven male branch managers that, like Black's, remained the same through their work tenures. The salary data of C.C., J.K. and T.S. is more relevant in this context due to the length of the individuals' employment with BBSI prior to their separation:

| Name | Base Salary (2006) | Base Salary at Present or Year of Separation |
|---|---|---|
| R.A. | $40,000 | $40,000 (2006) |
| J.B. | $36,000 (Nov 2000-Nov 2006) | $36,000 (2006) |
| C.C. | $33,000 | $33,000 (2010) |
| J.K. | $61,000 | $61,000 (2012) |
| R.R. | $34,000 | $34,000 (2008) |
| T.S. | $40,000 | $40,000 (2016) |
| J.W. | $60,000 | $60,000 (2007) |

(Dkt. 30-1 at 11.)

Finally, another chart shows the salaries of female branch managers who were paid higher starting base salaries than Black:

| Name | Year of Hire as Area Manager | Starting Base Salary as Area Manager |
|---|---|---|
| W.W. | 2005 | $80,000 |
| P.F. | 2006 | $80,000 |
| M.S. | 2006 | $100,000 |
| S.C. | 2007 | $80,000 |
| M.O. | 2008 | $90,000 |
| C.L. | 2011 | $100,000 |
| P.G. | 2013 | $100,000 |
| J.V. | 2013 | $100,000 |
| C.R. | 2013 | $100,000 |
| M.L. | 2015 | $100,000 |
| P.L. | 2018 | $100,000 |
| M.H. | 2015 | $100,000 |

(Dkt. 30-1 at 11) (chart split over page break in original).

The chart above shows that every female branch manager hired after 2011 was hired at the same $100,000 base annual salary as Christensen, Black's male replacement. This uncontested data supports BBSI's contention that it hired male and female branch managers at different base salaries throughout the relevant period with a trend toward hiring those with specific business experience at higher base rates. Again, Black does not

challenge BBSI's assertion that it changed its hiring strategy for branch managers, and that Christensen, Hix, and Williams fit within the new hiring strategy.

In sum, although it is not rare that an employee must rely on circumstantial evidence to implicate gender discrimination, in this matter, even when the Court takes Black's testimony as true, she fails to raise a genuine issue for the jury sufficient to survive summary judgment on the issue of pretext. Conversely, when the Court considers the record as a whole, it has been provided concrete evidence in the form of salary data and branch profitability figures that supports BBSI's legitimate, nondiscriminatory reasons for paying Black what it did and for hiring Christensen, Hix, and Williams at higher base salary levels. Therefore, the Court will grant BBSI's motion for summary judgment.

### 3.      Timeliness of Claims

In addition to challenging Black's claims on the merits, BBSI's motion for summary judgment also challenges the claims on the basis of timeliness. Although the Court conclusively finds that Black has failed to raise a genuine issue that BBSI's reasons for paying her less than it paid some male branch managers are pretextual under either the EPA or Title VII, the Court considered the fully briefed timeliness issues, as discussed below.

#### A.      *Timeliness of Equal Pay Act Claim*

BBSI argues that pursuant to the EPA, the statute of limitations on Black's claim began to run on the date Black received her final paycheck—January 11, 2016.

The Fair Labor Standards Act (FLSA) statute of limitations applies to EPA claims. *See* 29 U.S.C. § 255. The FSLA provides a two-year statute of limitations by which a plaintiff must file an EPA claim for wage discrimination with either the EEOC or applicable state agency. *See id.*; *Flores v. City of San Gabriel*, 824 F.3d 890, 895 (9th Cir. 2016). This two-year statute of limitations is extended to three years in the case of a "willful" violation of the EPA. *Id.* A cause of action under the EPA accrues each day that an employee is paid in a manner violating the statute. *See Batiz v. Am. Commercial Sec. Servs.*, 776 F. Supp. 2d 1087, 1096 (C.D. Cal. 2011). Notably, a party need not first file an administrative complaint to proceed with a civil action asserting an EPA claim.[7] *County of Washington v. Gunther*, 452 U.S. 161, 175, n.14 (1981). And, even if a party files an administrative complaint, the agency filing does not toll the two-year statute of limitations period—i.e. any civil action asserting an EPA claim must be filed within two or three years of the last day an employee is paid in a manner violating the statute. *Id.*

Black received her final paycheck on January 11, 2016. Black filed the present complaint on February 27, 2018—778 days later and 58 days after the EPA's standard two-year statute of limitations period ran. Thus, under the standard EPA calculation, Black's claim is untimely. Black argues, however, that the statute of limitations on her EPA claim did not begin to run until she learned of or discovered the pay disparity on November 23, 2016.

---

[7] U.S. Equal Employment Opportunity Commission, Time Limits on Filing a Charge, https://www. eeoc.gov/employees/timeliness.cfm (last visited May 21, 2019.)

Yet, as indicated above, the EPA's statute of limitations extends to three years in cases where the employer willfully violates the EPA. Black asserts that she has raised a genuine issue of material fact as to whether BBSI willfully violated the EPA, and thus the Court should decline to find, at the summary judgment stage, that her EPA claim is time-barred. Alternatively, she argues that equitable tolling should apply because it was impossible for her to know, during the course of her employment, that male employees were earning "near double" base salaries than those of female employees.

As evidence of willfulness, Black highlights that BBSI knowingly hired branch managers at the Idaho Falls, Meridian, and Twin Falls branches at base salaries higher than hers. Black asserts willfulness is also shown because BBSI, as a large sophisticated corporation with a human resources department, was at least aware of the requirements of the EPA. (Dkt. 32 at 13.) In support of her arguments, Black cites *McLaughlin v. Richland Shoe Co.*, a case where the Supreme Court of the United States discussed the meaning of the word "willful" in the context of statute of limitations applicable to the FLSA—and thus the EPA. 486 U.S. 128, 129 (1988). There, the Court rejected a standard of willfulness based on nothing more than an employer knowing "the FLSA was in the picture" because that standard virtually obliterated "any distinction between willful and nonwillful violations." *Id.* at 130-133. The high court found that, to be willful, the employer must either know or show reckless disregard as to whether its conduct is prohibited by the statute. *Id.* at 134.

Here, however, even when viewing the facts in a light most favorable to Black, there is no evidence to support a finding that BBSI knowingly violated the EPA or

showed reckless disregard as to whether its conduct was prohibited by the EPA. To the contrary, the evidence shows, as discussed above in the analysis of the merits of Black's claims, that BBSI hired men and women at various salary levels over the course the relevant ten year period—and that BBSI sometimes hired women at base salaries higher than other male branch managers. (*See* Dkt. 30-1 at 11-12.)

Further, there is no evidence that Black or any other employee raised the issue of pay disparity with BBSI during the relevant period—and thus no evidence that BBSI knew or showed reckless disregard for the fact that it was or may have been violating the EPA in its salary decisions. For these reasons, the Court finds no genuine issue of material fact exists as to whether BBSI's conduct was willful and therefore the Court declines to extend the statute of limitations to three years based on the willfulness standard. Thus, Black's EPA claim is time-barred unless the Court exercised its discretion to extend the statute of limitations. This issue is discussed further below.

### B. *Timeliness of Title VII Fair Pay Act Claim*

BBSI argues also, that according to the Lilly Ledbetter Fair Pay Act of Title VII, the statute of limitations on Black's Title VII claims began to run on the date Black received her final paycheck—January 11, 2016.

Title VII generally provides that an employee who wishes to bring a civil action for gender discrimination must file a claim with the EEOC no later than 300[8] days after

---

[8] "In a State having an entity authorized to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 101 (2002). In Idaho, EEOC claims

the alleged discrimination occurred. 42 U.S.C. § 2000e–5(e)(1). "To determine the timeliness of an EEOC complaint, the court first identifies the "unlawful employment practice." *Ricks*, 449 U.S. at 257. Title VII defines unlawful employment practice as the failure or refusal to hire, or discharge of an employee, or other discrimination with respect to "compensation, terms, conditions, or privileges of employment, because of ... race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)." *Beck v. Battelle Energy All., LLC*, No. 4:12-CV-00086-BLW, 2013 WL 587902, at *2 (D. Idaho Feb. 13, 2013). In 2009, Title VII was amended by the Lilly Ledbetter Fair Pay Act[9] (FPA) "to provide that each time a plaintiff receives a discriminatory paycheck, the clock for filing a Title VII" wage claim begins to run anew. *Mallard v. Battelle Energy All., LLC*, 2013 WL 2458620, at *4 (D. Idaho June 6, 2013); *see* 42 U.S.C. § 2000e-5(3)(A) and (B).

Here, Black received her last paycheck on January 11, 2016. She filed a Charge of Discrimination with the Idaho Human Rights Commission (IHRC) and the EEOC on January 9, 2017. The duration between January 11, 2016 and January 9, 2017 is 364 days. As detailed above, the statute of limitations for Title VII claims is 300 days. The full text of the FPA amendment to Title VII reads as follows:

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in

---

may be filed with the Idaho Human Rights Commission (IHRC). A charge filed only under the IHRA must be filed within 365 days of the alleged discrimination.

[9] For the purposes of the FPA, "an unlawful employment practice … with respect to discrimination in compensation" occurs (1) "when a discriminatory compensation decision or other practice is adopted;" (2) "when an individual becomes subject to a discriminatory compensation decision or other practice;" or (3) when an individual is affected by application of a discriminatory decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 42 U.S.C. § 2000e-5, PL 111-2.

**MEMORANDUM DECISION AND ORDER – 28**

> violation of this subchapter, when a discriminatory compensation decision or other practice *is adopted*, when *an individual becomes subject to* a discriminatory compensation decision or other practice, or when an individual *is affected by application of* a discriminatory compensation decision or other practice, *including each time wages, benefits, or other compensation is paid*, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e5(3)(A) (emphasis added).

Applying the FPA the context of this case shows that latest date by which Black's Title VII claim started to run was the last date she was paid or received benefits. That date is undisputed—it was January 11, 2019. Therefore, Black's Title VII claim is time-barred.[10]

## C. *The Discovery Rule and Equitable Tolling*

Notwithstanding the foregoing, there are two doctrines that may apply to extend the statute of limitations periods on Black's claims—the "discovery rule" and equitable tolling. Black asserts that the Court should consider November 23, 2016, as the date when the statute of limitations period began to run. Black argues that it was on that date that another former female BBSI branch manager informed her that male BBSI branch managers were being paid a base annual salary of $100,000 a year. (Dkt. 32 at 7.) Black asserts that, prior to November 23, 2016, she believed that all branch managers received the same base salary. *Id.*

---

[10] Of note, although Black timely filed her complaint with the IHRC, a claim based on state law was not pursued in this lawsuit. Regardless of the 365-day statute of limitations that would have been applied to any such claim, it would be futile for the Court to allow Black to amend her complaint to add a claim based on state law due to the Court's finding that summary judgment is warranted on the merits of both Black's EPA claim and Title VII claim.

Generally, a "discovery rule" "postpones the beginning of the limitations period from the date the plaintiff is actually [legally] injured to the date when [she] discovers (or reasonable should discover) [she] has been injured." *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008). The United States Court of Appeals for the Ninth Circuit has held that the discovery rule does not apply to extend limitations periods in the context of federal civil rights actions.[11] *Id.* at 1051. In these contexts, a "claim accrues under federal law when the plaintiff knows or has reason to know of the actual injury." *Id.*

However, the doctrine of equitable tolling may apply to extend the statute of limitations when there is evidence of excusable delay by the plaintiff. *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008). The Court has discretion to determine whether it would be proper to apply this equitable doctrine; however, it is "to be applied sparingly.*" See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

In the context of employment discrimination claims, courts have tolled the statute of limitations when the plaintiff could not have known that an employer's adverse decision was based on discriminatory motive or intent. *Pronechen v. Sec'y of U.S. Dep't of Homeland Sec.*, 2010 WL 1239318, at *2 (E.D. Cal. Mar. 25, 2010) (denying summary judgment on equitable tolling issue where "a material issue of fact exists, as to whether

---

[11] Further, and as pointed out by BBSI, Congress specifically considered and rejected an amendment to the FPA that would have permitted a plaintiff to file an administrative complaint within 300 days of the plaintiff's discovery of a difference in pay. (Dkt. 33 at 2) (citing 155 Cong. Rec. S451, 588 (Daily Ed. Jan. 15, 2009)).

Plaintiff had notice of the possibility of the alleged age discrimination."); *Sterrett v. Mabus*, 2013 WL 593752, at *5 (S.D. Cal. Feb. 15, 2013) (finding no continuing violation under Title VII but tolling the statute for discrete acts that occurred before the employee "realize[d] the employment decision was the result of gender discrimination."); *see also Horita v. Kauai Island Util. Co–op*, 352 Fed. Appx. 194, 195 (9th Cir. 2009) (noting plaintiff could have raised equitable tolling to toll the statute of limitations for her Title VII claim to the date "when Plaintiff claims she first learned of discriminatory intent (and thus of her claim)").

Here, as fully set forth above in regard to the merits of the EPA and Title VII claims, Black failed to present evidence sufficient to survive summary judgment on the issue of discriminatory motive or intent. As suggested by the case law above, the Court lacks evidence to provide a foundation for tolling the applicable statutes of limitations to the date Black learned, as alleged, that BBSI's salary decisions were based on discriminatory intent or animus. However, because the Court conclusively finds that summary judgment is warranted on Black's claims, it will not affirmatively decide the equitable tolling issue.

## CONCLUSION

The Court will grant BBSI's motion for summary judgment. Although Black provided evidence that she performed substantially similar work for pay that was lower than some male branch managers, she failed to present evidence raising a genuine issue that BBSI's reasons for paying her less than it paid some male branch managers were pretextual as required by the Equal Employment Act. Black also failed provide any

evidence showing BBSI's decision for the pay disparity was motivated by discriminatory intent as required by Title VII.

**ORDER**

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Defendant's Motion for Summary Judgment (Dkt. 30) is **GRANTED**.

DATED: May 23, 2019

Candy W. Dale
U.S. Magistrate Judge